[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 139.]

MCKIMM, APPELLEE, *v*. OHIO ELECTIONS COMMISSION, APPELLANT.

[Cite as *McKimm v. Ohio Elections Comm.*, 2000-Ohio-118.]

*Elections—Distribution of campaign brochure containing an illustration and text that imply that candidate's opponent committed an illegal act—Ohio Elections Commission may find violation of R.C. 3517.21(B)(10), when.*

When a candidate for public office distributes a campaign brochure containing an illustration and accompanying text that imply to the reasonable reader that the candidate's opponent committed an illegal act while in office, and the candidate lacks any basis to believe that the opponent committed the act depicted in the brochure, the Ohio Elections Commission may constitutionally determine that the candidate violated R.C. 3517.21(B)(10).

(No. 99-305—Submitted January 25, 2000—Decided June 14, 2000.)

APPEAL from the Court of Appeals for Franklin County, No. 98AP-304.

―――――――――――

{¶ 1} In the November 1995 election for Jackson Township Trustee, Dan McKimm challenged the incumbent candidate, Randy Gonzalez. McKimm won the election. A few days before the voting took place, McKimm had mailed a campaign brochure to township voters. A full page of McKimm's brochure consisted of "[a] multiple-choice Jackson quiz to help you select the best candidate." The quiz contained eighteen multiple-choice questions, and several of these were accompanied by small, cartoon-like illustrations. McKimm suggested the "correct" answers to the questions by indicating them in bold print. Most of McKimm's questions mentioned Gonzalez by name and discussed Gonzalez's actions during his tenure as trustee. At the top of the page, the brochure indicated to township voters that "[r]esearch documentation" was available and provided the telephone number of McKimm's campaign chairman.

**{¶ 2}** After reading the brochure, Gonzalez filed a complaint with the Ohio Elections Commission, alleging that McKimm violated Ohio's election laws by disseminating several of the statements included in the brochure. Specifically, Gonzalez alleged that McKimm violated R.C. 3517.21, which provides:

"(B) No person, during the course of any campaign for nomination or election to public office or office of a political party, by means of campaign materials, * * * shall knowingly and with intent to affect the outcome of such campaign do any of the following:

" * * *

"(10) Post, publish, circulate, distribute, or otherwise disseminate a false statement concerning a candidate, either knowing the same to be false or with reckless disregard of whether it was false or not, if the statement is designed to promote the election, nomination, or defeat of the candidate."

**{¶ 3}** Question No. 7 and its accompanying illustration were among the items Gonzalez challenged in his affidavit. Question No. 7 read as follows:

"**7. Which of the following is true?**

"A. Trustees have a policy of bidding **all** contracts greater than $10,000.

"B. Randy Gonzalez **ignored** bidding policy. He voted to contract an architect for $51,000 to design the Social Hall (pavilion) ***without taking bids.***

"**C.** This one is tricky. Both A and B are true." (Emphasis *sic*.)

**{¶ 4}** An illustration accompanied the text of Question No. 7. In the drawing, a human hand extends toward the reader from underneath the corner of a table. The hand holds a bundle of cash, and small lines drawn around the bundle give the reader the impression of motion—as if the hand is waving the cash back and forth underneath the table. For the convenience of the reader, we have appended a reproduction of Question No. 7 and its accompanying illustration to the end of this opinion, as well as a reproduction of the "quiz" page of McKimm's brochure.

2

{¶ 5} In his affidavit to the commission, Gonzalez alleged that Question No. 7 "indicates by representation that [Gonzalez] accepted money under the table, or solicited a bribe or kickback in return for awarding the contract referred to." Gonzalez denied that he ever received, solicited, or encouraged a bribe in relation to the contract. In a written response, McKimm disagreed with Gonzalez's characterization of the illustration. McKimm maintained that "[t]he drawing included with Item No. 7 of the Circular depicts my personal belief that the decision of complainant Gonzalez to disregard the Board's own policy * * * and to instead award a contract to a contractor on the basis of personal preference, and unsubstantiated 'freebies,' * * * is fairly characterized as underhanded, less than open, and hidden beneath the table of secrecy if you will."

{¶ 6} At a hearing before the Elections Commission, McKimm conceded that he distributed the brochure intending to affect the outcome of the campaign and to promote his candidacy. When Gonzalez's attorney asked McKimm why he included illustrations in the brochure, McKimm testified that he intended the drawings "to lend, if you will, substance or credibility to the [adjacent] text."

{¶ 7} When the parties turned specifically to Question No. 7 and its accompanying illustration, McKimm initially argued that the drawing did not actually depict a hand waving money *under* the table. He testified that the hand was drawn either behind or to the side of the table. Nevertheless, McKimm answered affirmatively when Gonzalez's attorney asked him to refer to the exhibit depicting "the money under the table." And Commissioner Duncan stated on the record that the drawing "clearly" depicted a hand waving cash underneath the table.

{¶ 8} McKimm conceded that he had heard of the phrase "passing money under the table," while denying that he intended the cartoon to suggest that Gonzalez had taken a bribe. When asked if he had any evidence that Gonzalez had ever taken a bribe during his tenure as trustee, McKimm replied, "No, sir."

3

**{¶ 9}** For his part, Gonzalez testified that his vote on the unbid construction contract was a legal action that occurred at a public meeting.

**{¶ 10}** Commissioner Webster urged the commission to find that McKimm's brochure "in its totality," and by clear and convincing evidence, violated Ohio's election laws, and his motion passed by a vote of five to two. Though the commission declined to refer the matter to a prosecutor, the commission issued a reprimand letter. The two commissioners who voted against the motion described the cartoon as "sleazy" and "offensive," but concluded that all of the challenged statements in the brochure were protected by the First Amendment.

**{¶ 11}** McKimm appealed the commission's order to the Franklin County Court of Common Pleas. The common pleas court affirmed the commission's order, but only insofar as the illustration accompanying Question No. 7 was concerned. The court determined that the constitutional guarantees of free speech protected the *text* of Question No. 7 and the other items that Gonzalez had challenged. As for the cash-under-the-table cartoon, however, the court agreed with the commission that the hand-under-the-table drawing carried the "clear and obvious implication that [Gonzalez], in voting to violate township policy, received money—under the table—in return." According to the trial court, the cash-under-the-table drawing suggested that Gonzalez had taken "money under the table to award a contract without competitive bidding and therefore was guilty of bribery," even though "no evidence exists to support" that implication.

**{¶ 12}** McKimm appealed the decision to the Franklin County Court of Appeals, and that court reversed the decision of the trial court. The appellate court decided that "the evidence in the record is insufficient to establish by convincing clarity that [McKimm] published the illustration accompanying question No. 7 with knowledge that it was false or in reckless disregard of its falsity."

**{¶ 13}** The cause is now before this court upon the allowance of a discretionary appeal.

---

*Betty D. Montgomery*, Attorney General, *Edward B. Foley*, State Solicitor, and *David M. Gormley*, Associate Solicitor, for appellant.

*Daniel J. McGown*, for appellee.

---

**Cook, J.**

**{¶ 14}** The cartoon drawing at the heart of this case presents this court with an opportunity to clarify the relationship between Ohio's election laws and the constitutional guarantees of free speech. The General Assembly empowered the Ohio Elections Commission to investigate allegations regarding the dissemination of false and misleading statements by candidates for public office in Ohio, and to take appropriate action when it concludes that a violation has occurred. The commission may exercise its authority, however, only when that authority does not clash with the freedoms of speech and press independently recognized by the United States and Ohio Constitutions.

**{¶ 15}** The trial court determined that the commission properly reprimanded Dan McKimm for publishing the illustration contained in his campaign brochure. But the court of appeals reversed, holding that the commission's order violated the First Amendment to the United States Constitution. Because we determine that the court of appeals erred in its analysis of the constitutional issues in this case, we reverse.

The Elements of R.C. 3517.21(B)(10)

**{¶ 16}** At the commission hearing, McKimm conceded that he distributed the brochure intending to affect the outcome of the campaign and to promote his candidacy. All that remained for the commission to determine, therefore, was whether McKimm disseminated (1) a false statement about his opponent, (2)

5

"knowing the same to be false or with reckless disregard of whether it was false or not."  R.C. 3517.21(B)(10).[1]

{¶ 17} The court of appeals reversed the decision of the trial court on the basis of the second element (termed "actual malice"), holding that the record did not contain clear and convincing evidence that McKimm distributed the cartoon with actual malice.  Because we analyze the evidentiary requirements differently than the court of appeals, we conclude that the evidence supports the commission's findings regarding both elements.

{¶ 18} In Part A, below, we agree with the trial court that, to the reasonable reader, McKimm's cartoon constitutes a false statement of fact: that Gonzalez accepted a bribe or received an illegal kickback when he voted to award the unbid contract.  In Part B, we conclude that, since there was sufficient evidence for the Elections Commission to draw the reasonable inference that McKimm *intended* to convey the very message that he *did* convey about Gonzalez's "crime," and since McKimm admitted that he had no basis to believe that Gonzalez committed bribery during his tenure as trustee, McKimm disseminated the brochure containing this reasonable connotation of bribery with actual malice.

A.  McKimm's Money-Under-the-Table Cartoon:  To the Reasonable Reader, a
False Statement that Gonzalez Committed Bribery

---

1.  The commission must apply a standard of clear and convincing evidence with respect to findings under R.C. 3517.21.  R.C. 3517.155(D).  Former R.C. 3599.091, which also forbade falsehoods in election campaigns (subsection [B]), permitted the commission to impose fines and issue cease-and-desist orders under a lesser preponderance standard (subsection [C]), but the Sixth Circuit held these enforcement methods unconstitutional, since the United States Supreme Court had determined that "no punishment may be levied in areas trenching on the first amendment involving public figures without 'clear and convincing evidence.' "  *Pestrak v. Ohio Elections Comm.* (C.A.6, 1991), 926 F.2d 573, 578, citing *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 285-286, 84 S.Ct. 710, 728-729, 11 L.Ed.2d 686, 709-710.

{¶ 19} The common pleas court determined that the illustration accompanying Question No. 7 made "a clear and obvious implication that [Gonzalez], in voting to violate township policy, received money—under the table—in return." We agree. Under both the United States and Ohio Constitutions, courts assess the meaning of an allegedly libelous statement under an objective standard—that of the reasonable reader. *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 21, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1, 19; *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 282, 649 N.E.2d 182, 186.

1. The United States Supreme Court's Reasonable-Reader Standard

{¶ 20} In *Milkovich v. Lorain Journal Co.*, the United States Supreme Court applied an objective standard to assess the meaning of allegedly libelous statements in a newspaper column concerning a high school wrestling coach's testimony before a common pleas court. (1990), 497 U.S. at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19. The title of the column stated that the high school "beat the law with the 'big lie.'" Other statements in the column suggested that lies were told during the proceedings, such as the phrase, "If you get in a jam, lie your way out." The coach sued the newspaper and columnist, alleging that these and other statements in the column in effect accused him of committing the crime of perjury.

{¶ 21} On appeal, the United States Supreme Court determined that "[t]he dispositive question * * * becomes whether a *reasonable factfinder* could conclude that the statements in the * * * column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding." (Emphasis added.) *Id.*, 497 U.S. at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19. The Supreme Court concluded that the average reader of the column would be left with just such an impression—that the wrestling coach perjured himself in order to avoid the athletic association's orders against his team. *Id.* To reach this conclusion, the Supreme Court did not consider the columnist's subjective interpretation of the statements in his column. Rather,

7

the court assessed the "clear impact," "general tenor," and "impression" created by the statements in the column. *Id.*

{¶ 22} Just after deciding *Milkovich*, the United States Supreme Court again applied an objective, reasonable-reader standard. See *Masson v. New Yorker Magazine, Inc.* (1991), 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447. In *Masson*, the court considered whether quotations in a magazine, attributed to a noted psychoanalyst, were verbatim reports of statements that the psychoanalyst actually made or were "nonliteral * * * reconstructions" of Masson's statements. *Id.*, 501 U.S. at 513, 111 S.Ct. at 2431, 115 L.Ed.2d at 470. Because the publisher or author failed to warn the reader that the quotations might not be verbatim, and because the magazine had a reputation for "scrupulous factual accuracy," the Supreme Court concluded that "the *reasonable reader* would understand the quotations to be nearly verbatim reports of statements made by the subject." (Emphasis added.) *Id.* Taken together, *Milkovich* and *Masson* stand for the proposition that, under the United States Constitution, courts assess the meaning of an allegedly libelous statement from the perspective of the reasonable reader—not from the perspective of the publisher of the statement.

### 2. Ohio's Reasonable-Reader Standard

{¶ 23} Even though this court responded to *Milkovich* by holding that the Ohio Constitution provides a separate and independent guarantee of protection for opinions, we still assess "the common meaning ascribed to the words by an ordinary reader" in order to determine whether an allegedly libelous statement is a false statement of fact. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 282, 649 N.E.2d 182, 186; *In re Harper* (1996), 77 Ohio St.3d 211, 228, 673 N.E.2d 1253, 1267. All four factors of Ohio's test for distinguishing a statement of fact from an opinion depend on the reasonable reader's perception of the statement—not on the perception of the publisher. *Vail, supra,* 72 Ohio St.3d at 282-283, 649

N.E.2d at 185-186; *Scott v. News-Herald* (1986), 25 Ohio St.3d 243, 251-253, 25 OBR 302, 309-311, 496 N.E.2d 699, 707-708.[2]

{¶ 24} As *Milkovich, Masson, Vail,* and *Harper* demonstrate, then, the law charges the author of an allegedly defamatory statement with the meaning that the reasonable reader attaches to that statement. See, also, 3 Restatement of the Law 2d, Torts (1977), Section 563 ("The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express."). If the law were otherwise, publishers of false statements of fact could routinely escape liability for their harmful and false assertions simply by advancing a harmless, subjective interpretation of those statements.

3. Application of the Reasonable-Reader Standard to McKimm's Cartoon

{¶ 25} In the case at bar, the Elections Commission could not reprimand McKimm for the illustration accompanying Question No. 7 unless the cartoon, to the reasonable reader, constituted a false statement of fact about Gonzalez. R.C. 3517.21(B)(10); *Milkovich*; *Vail*. We conclude that the commission and trial court correctly assessed the meaning of McKimm's cartoon from the perspective of the reasonable reader and that the average reader would view the cartoon as a false factual assertion that Gonzalez accepted cash in exchange for his vote to award the unbid construction contract.

---

2. The first factor, the court's inquiry into the specific language used, focuses on "the common meaning ascribed to the words by an ordinary reader." Under the second factor, which examines whether the allegedly defamatory statement is verifiable, we noted that when a statement "lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content." *Vail, supra,* 72 Ohio St.3d at 282-283, 649 N.E.2d at 186. The third factor considers the reaction of "the average reader viewing the words in their internal context," and the fourth factor focuses on the broader context of the statement from "the reader's viewpoint." *Scott, supra,* 25 Ohio St.3d at 253, 25 OBR at 311, 496 N.E.2d at 708.

{¶ 26} Commissioner Duncan explicitly referred to the appropriate standard when he said, "[O]ne wonders what it was that a *reasonable reader* would perceive after having seen this cartoon." (Emphasis added.) Shortly thereafter, Commissioner Duncan concluded—along with the other commissioners who voted to reprimand McKimm—that the cartoon unambiguously depicted Gonzalez engaging in unlawful activity. Likewise, citing *Milkovich* and *Vail*, the common pleas judge determined that McKimm's illustration was "capable of only one *reasonable* interpretation: which is [that Gonzalez] took money under the table to award a contract without competitive bidding and therefore was guilty of bribery." (Emphasis added.)

{¶ 27} The phrase "passing money under the table" connotes an illegal transaction made for personal gain. The drawing depicting this illegal conduct appeared adjacent to text in a "quiz" that made serious and specific allegations about Gonzalez's conduct as a trustee. The quiz even included a phone number for voters to call for documentation—suggesting that the statements therein could be proven true. And a political cartoon that falsely depicts a public official engaging in illegal conduct will not be exempt from legal redress merely because the charge is depicted graphically rather than verbally. See 50 American Jurisprudence 2d (1995), Libel and Slander, Section 152.

{¶ 28} As the commission notes in its merit brief, "We all know what a hand under a table holding cash implies, particularly * * * in the context of a discussion about a government contract being let contrary to standard policy and without competitive bidding." McKimm's cartoon implied to the reasonable reader that Gonzalez actually accepted cash for his vote to award the lucrative, unbid construction contract. Accord *DeVito v. Gollinger* (1999), 133 Ohio App.3d 51, 56, 726 N.E.2d 1048, 1052 ("The 'under the table' transaction depicted in the cartoon is a clear accusation of bribery, a particularly egregious offense by a public

official."); see, also, *Newman v. Delahunty* (1994), 293 N.J.Super. 491, 517, 681 A.2d 671, 684 (cartoon about mayor was a "not so subtle" charge of corruption).

### 4. The Innocent-Construction Rule

**{¶ 29}** McKimm maintains that the Elections Commission could not find a violation of the election laws for speech that is "clearly susceptible [of] innocent interpretation." Here, McKimm refers to the rule that "if allegedly defamatory words are susceptible [of] two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 372, 6 OBR 421, 423, 453 N.E.2d 666, 669.

**{¶ 30}** The innocent-construction rule does not protect McKimm's cartoon in this case. The rule protects only those statements that are *reasonably* susceptible of an innocent construction. *Id.* "To construe a publication in an unreasonable manner in order to give it an innocent interpretation is itself incompatible with the rule's requirement that words be given their 'natural and obvious meaning.' " 8 Speiser, Krause & Gans, The American Law of Torts (1991) 436, Section 29:39, citing *John v. Tribune Co.* (1962), 24 Ill.2d 437, 181 N.E.2d 105. Because we agree with the trial court that McKimm's drawing of a hand passing cash under a table is susceptible of but one reasonable interpretation—that Gonzalez accepted money in exchange for his vote to award the unbid contract referred to in the accompanying text—the rule is inapplicable.

### B. McKimm Disseminated the Cartoon with Actual Malice

**{¶ 31}** Having determined that McKimm's cartoon was defamatory, we turn to the only remaining issue: whether McKimm published the cartoon with actual malice—that is, either knowing that it was false or acting in reckless disregard of whether it was false or not. R.C. 3517.21(B)(10); *Pestrak v. Ohio Elections Comm.* (C.A.6, 1991), 926 F.2d 573, 577, citing *New York Times Co. v.*

*Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, and *Garrison v. Louisiana* (1964), 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133.

### 1. The Role of the Actual-Malice Standard

**{¶ 32}** By permitting liability only for those false statements about public officials made with actual malice, courts promote robust criticism of public officials in their conduct of governmental affairs. *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 334, 94 S.Ct. 2997, 3004, 41 L.Ed.2d 789, 802. Public officials will often be subject to "vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times, supra,* 376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701. By prohibiting the imposition of strict liability for false statements made against public figures, the actual-malice standard provides essential "breathing space" for the criticism that is inevitable in free debate and crucial to our democratic system. *Philadelphia Newspapers, Inc. v. Hepps* (1986), 475 U.S. 767, 772, 106 S.Ct. 1558, 1561, 89 L.Ed.2d 783, 790, quoting *New York Times, supra,* 376 U.S. at 272, 84 S.Ct. at 721, 11 L.Ed.2d at 701.

**{¶ 33}** On the other hand, the actual-malice standard is not an impenetrable shield for the benefit of those who engage in false speech about public figures. "[F]alse speech, even political speech, does not merit constitutional protection if the speaker knows of the falsehood or recklessly disregards the truth." *Pestrak, supra*, 926 F.2d at 577. "[T]he use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. * * * Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Garrison, supra,* 379 U.S. at 75, 85 S.Ct. at 216, 13 L.Ed.2d at 133.

2. The Evidentiary Requirements of the Actual-Malice Standard

{¶ 34} Whether the evidence in the record supports a finding of actual malice is a question of law. *Harte-Hanks Communications, Inc. v. Connaughton* (1989), 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562, 587. To answer this question, we are obliged to undertake an independent review of the record. *Id.* at 659, 109 S.Ct. at 2681, 105 L.Ed.2d at 571. We may not infer the existence of actual malice from evidence of personal spite or ill will alone; rather, our focus is on the publisher's attitude toward the truth or falsity of the publication. *Perez v. Scripps-Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 520 N.E.2d 198, paragraph two of the syllabus. But evidence of ill will can be relevant: " 'This standard requires a clear and convincing showing, which may be by *circumstantial evidence*, of the defendant's actual state of mind—either subjective awareness of probable falsity or actual intent to publish falsely.' " (Emphasis added.) *National Rifle Assn. v. Dayton Newspapers, Inc.* (S.D.Ohio 1983), 555 F.Supp. 1299, 1304, quoting *Yiamouyiannis v. Consumers Union of United States, Inc.* (C.A.2 1980), 619 F.2d 932, 940.

{¶ 35} To support its interpretation of the evidence required to support a finding of actual malice, the court of appeals relied on the decision of the Supreme Court in *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502. But the *Bose* court found clear and convincing evidence of actual malice lacking only because the author's statement—which misdescribed the sound of a loudspeaker in a Consumer Reports review—"was 'one of a number of possible rational interpretations' of an event that 'bristled with ambiguities.' " *Id.* at 512, 104 S.Ct. at 1966, 80 L.Ed.2d at 525, quoting *Time, Inc. v. Pape* (1971), 401 U.S. 279, 290, 91 S.Ct. 633, 639, 28 L.Ed.2d 45, 53. McKimm's cartoon, on the other hand, judged by the reasonable-reader standard, suggested that Gonzalez engaged in an illegal act. A cartoon that depicts the commission of an illegal act is not a "possible rational interpretation" of events

when the author has *no basis* to believe that an illegal act has occurred. Accordingly, we conclude that the appellate court's reliance on *Bose* was misplaced.

**{¶ 36}** In *St. Amant v. Thompson* (1968), 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262, also cited by the court of appeals, the Supreme Court discussed the evidence that is required to support a conclusion that a defamation defendant has acted in reckless disregard of the truth or falsity of his or her publication. The *Thompson* court held that "[t]here must be sufficient evidence to permit the conclusion that *the defendant in fact entertained serious doubts* as to the truth of his publication." (Emphasis added.) *Id.,* 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267.

**{¶ 37}** *Thompson* certainly requires evidence of the defendant's subjective state of mind in order to satisfy the actual-malice standard. *Id.* at 733, 88 S.Ct. at 1326, 20 L.Ed.2d at 268. But *Thompson* also explicitly limits the ability of defendants to subvert the standard with self-serving testimony. "The defendant * * * cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, [or] is the product of his imagination * * * ." *Id.*, 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267-268.

**{¶ 38}** We conclude that the record in this case clearly and convincingly confirms that McKimm's conduct surpassed the actual-malice threshold. McKimm's testimony before the commission amply supported that body's conclusion—and our own—that McKimm *intended* to convey to township voters the false message that the drawing *did* convey to the reasonable reader of his brochure.

{¶ 39} McKimm knew that Gonzalez and the other trustees were not legally obliged to solicit bids for the construction contract before awarding it, and knew that the trustees awarded the unbid contract only after discussion in an open meeting. McKimm also testified, however, that he personally disapproved of Gonzalez's vote, and that he felt a wrongdoing had occurred. In this, McKimm saw an opportunity—for he testified that, if township voters were aware of what happened, "they would have reacted in the same fashion that I did."

{¶ 40} But instead of merely disseminating his brochure with the bare facts that appeared in the text of Question No. 7, McKimm chose to accompany those facts with a cartoon. That cartoon, as we have already determined, unambiguously depicts a hand passing money under the table—a concept with which McKimm admitted he was personally familiar. McKimm, however, also admitted that he had *no basis* to believe that Gonzalez had engaged in any illegal conduct during his tenure as trustee. As the trial court determined, McKimm chose "to illustrate the right of the voters to question [Gonzalez's] conduct by illustrating a criminal act, where no evidence exists to support such an act."

{¶ 41} When called to answer for his choice before the commission, McKimm admitted that he knew of the phrase "passing money under the table," and that he had no basis to believe that Gonzalez had participated in such an act— or any illegal acts—during his tenure as trustee. McKimm also testified implausibly his drawing appeared either on the "other side of the table," or "behind the table," but "not under the table." See *Thompson, supra,* 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267-268. After our independent review of this record, we agree with the commission and the trial court that McKimm disseminated his cartoon well aware of its false implication. McKimm conveyed a message to the reasonable reader that he knew had no basis in fact.

Conclusion

**{¶ 42}** The commission properly acted in this case to recognize society's "pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer* (1966), 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597, 605. [3]

**{¶ 43}** For the foregoing reasons, we hold that when a candidate for public office distributes a campaign brochure containing an illustration with accompanying text that imply to the reasonable reader that the candidate's opponent committed an illegal act while in office, and the candidate lacks any basis to believe that the opponent committed the act depicted in the brochure, the Ohio Elections Commission may constitutionally determine that the candidate violated R.C. 3517.21(B)(10). Accordingly, we reverse the decision of the court of appeals, and reinstate the decision of the trial court.

*Judgment reversed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

————————————

APPENDIX

————————————

3. McKimm argues for the first time to this court that the commission lacked the authority to send him a letter of reprimand or to punish him "by publicly branding him as a violator of O.R.C. § 3517.21(B), a criminal offense." McKimm did not raise this objection before the commission, the common pleas court, or the court of appeals. Accordingly, we do not address this issue here. In general, "an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

Appendix 1

7. **Which of the following is true?**
   A. Trustees have a policy of bidding **all** contracts greater than $10,000.
   B. Randy Gonzalez **ignored** bidding policy. He voted to contract an architect for $51,000 to design the Social Hall (pavilion) *without taking bids.*
   **C.** This one is tricky. Both A.... and B. are true.



27

Appendix 2



28