OPINION
In October 1999, the Polaris Owners Association filed two complaints with the Ohio Elections Commission ("Commission") against Citizens to Save Northland ("Northland"), a political action committee which sponsored "Issue 33." Issue 33 sought the repeal of an ordinance which created the Polaris tax increment financing ("TIF") district to promote economic development of the Polaris Center of Commerce, a business district in Columbus, Ohio, located in southern Delaware County.
In December 1996, the city of Columbus passed Ordinance 3106-96. Pursuant to that ordinance, real property owners within the geographical boundaries of the Polaris TIF district pay into the fund annual payments in lieu of, and in an amount equal to, the real estate tax on the improved value of their property. Pursuant to Ordinance 3106-96, all payments deposited into the Polaris TIF fund "shall be used solely for the following purposes":
 a) to pay all reasonable, ordinary and customary costs of designing, financing, constructing and maintaining the Public Improvements;
 b) as security for and to pay the costs of issuance and interest on and principal of bonds or notes issued in order to finance the Public Improvements[.]
The Ordinance classifies "Public Improvements" as:
 1. The widening and expansion of Polaris Parkway, with appropriate signalization, turn lanes and related improve-ments.
 2. The extension, widening and expansion of Gemini Parkway, with appropriate signalization and other improve-ments.
 3. Improvements to the Polaris I-71 interchange and improvements to I-71 between I-270 and the Polaris I-71 interchange.
4. Water, sanitary sewer and storm sewer improvements.
5. A bridge over I-71.
In the spring of 1999, real estate developer Herb Glimcher approached the city of Columbus with a proposal to improve the roadways and infrastructure serving the Polaris business district in general, as well as ingress and egress to the Glimcher-planned Polaris Fashion Mall. As development of the business district and new mall progressed, The Richard E. Jacobs Group ("The Jacobs Group"), which owns and operates Northland mall, formed Citizens to Save Northland in order to thwart the use of the TIF district as a vehicle to promote the economic growth of the area, and indirectly the construction of the Polaris Fashion Mall.[1]
In support of Issue 33, Citizens to Save Northland produced and aired several radio and television commercials. The first complaint filed by the Polaris Owners Association asserted that seven factual statements contained in Northland's campaign material were false. As set forth by the trial court, those statements were:
 1) There's a wealthy developer who's getting up to $22 million of our tax dollars to help him develop and build a mall in Delaware County.
 2) Columbus is about to give up to $22 million of taxpayer's money to help a wealthy developer build and develop a mall in Delaware County.
 3) Unfortunately, it'll probably mean the closing of Northland Mall. And for the Columbus schools, it'll mean getting $640,000 less every year.
 4) So, a vote for Issue 33 will stop this ridiculous giveaway of our tax dollars.
 5) It is simple. A vote for Issue 33 will stop the giveaway of our tax dollars to help a wealthy developer build and develop a mall we don't even need.
6) A vote against Issue 33 and the money's all his.
 7) Vote against Issue 33 and the money's all his. [12/28/00 Decision at 3.]
On October 19, 1999, the Commission found probable cause to believe that Northland had violated R.C. 3517.22 by publishing political campaign material which contained false statements of fact. After a subsequent evidentiary hearing, the Commission unanimously found that Northland had violated R.C. 3517.22(B)(2) in publishing those seven statements. Pursuant to R.C. 3517.155(D)(2), the Commission then referred its findings to the Franklin County Prosecuting Attorney for further action.
Shortly after the first probable cause hearing, Northland aired another television commercial in which a "cash patrol," fashioned after the current television advertisements for Publishers Clearing House, presented a check made out to "wealthy developer" from "City of Columbus Taxpayers." When the developer answered his door, the cash patrol exclaimed; "Congratulations. We're giving you up to $22 million of taxpayers' money." An announcer then stated: "Believe it or not this is actually happening. A wealthy developer is getting up to $22 million of your tax dollars to help him develop and build a mall we don't need. A vote for Issue 33 will stop this ridiculous giveaway of our tax dollars. Vote against Issue 33 and the money's all his."
Northland's "cash patrol" advertisement provoked a second complaint which named Northland, Peggy McElroy ("McElroy"), Northland's Chairperson, The Jacobs Group, and Donald Jones, Jacobs' Vice President. On October 28, 1999, the Commission again found probable cause to believe that R.C. 3517.22 had been violated. An evidentiary hearing was held by the Commission on April 20 and 25, 2000. On April 25, 2000, the Commission unanimously found that Northland, The Jacobs Group, Donald Jones, and McElroy, had violated R.C. 3517.22(B)(2) by causing the broadcast of false statements in this commercial. As it had done with the first, the Commission referred its findings to the prosecuting attorney.
After the second referral, Northland, McElroy, The Jacobs Group, and Donald Jones appealed each of the Commission's decisions to the Franklin County Court of Common Pleas. On December 28, 2000, that court affirmed both decisions finding that: (1) the Polaris TIF funds, by definition, are allocated to pay only for public, not private, improvements; (2) that Polaris TIF money would not in any way pay for the building of the Polaris Fashion Mall; (3) that Polaris TIF money would not be paid to an individual, nor would a "wealthy developer" in any manner receive such funds; (4) that the Columbus Public Schools would not be impacted as Polaris tax dollars fund the Olentangy School District, not the Columbus Public School District; (5) that the real property owners within the Polaris TIF district contribute to the fund, not Columbus taxpayers in general; and (6) that the $22 million figure used in the commercials was inaccurate. Upon receipt of this decision, all parties timely appealed to this court. However, with the exception of McElroy, all parties subsequently dismissed their appeals. Therefore, all that remains is the second complaint concerning the "cash patrol" advertisement, and the Commission's decision to issue appellant a public reprimand. Appellant appeals raising the following assignments of error:
 [1.] The court erred in affirming a finding that Mrs. McElroy made false statements in violation of O.R.C. § 3517.22(B) when it was undisputed that Mrs. McElroy did not cause the statements to be published.
 [2.] The court erred in affirming a finding that Mrs. McElroy "knowingly and with actual malice" made false statements in violation of O.R.C. § 3517.22(B) when it was undisputed that Mrs. McElroy did not draft, develop, review, approve, publish, or even see the allegedly false statements.
 [3.] The court erred in holding that the statements at issue here, which characterized the effect of an existing law, were statements of fact.
 [4.] The court erred in affirming a finding that Mrs. McElroy "knowingly and with actual malice" made false statements in violation of O.R.C. § 3517.22(B) when it was undisputed that Citizens to Save Northland relied upon qualified professionals (including legal counsel) who unequivocally advised Citizens to Save Northland that the statements were true.
 [5.] The court erred in affirming a finding that Mrs. McElroy "knowingly and with actual malice" made false statements in violation of O.R.C. § 3517.22(B) when the evidence established that a reasonable basis existed to believe the statements were true.
In her first and second assignments of error, appellant claims the trial court erred in affirming the Commission's finding that she was involved in publishing the "cash patrol" advertisement. In support of these assignments of error, appellant relies upon several self-serving statements that she was not involved with the production of the "cash patrol" advertisement and, therefore, did not cause the false statements in that advertisement to be published. However, appellant's claim is clearly belied by the fact that her name appeared on all of Northland's campaign material, including the very advertisement in question.
Former R.C. 3517.20(A) broadly, clearly, and unequivocally required that all political advertisements conspicuously include the name and address of the chairperson, treasurer, or secretary of the organization issuing the advertisement:
 No person shall write, print, post, or distribute, or cause to be written, printed, posted, or distributed, a notice, placard, dodger, advertisement, sample ballot, or any other form of general publication that is designed to promote the nomination, election, or defeat of a candidate, to promote the adoption or defeat of an issue, or to influence the voters in an election, or shall make an expenditure for the purpose of financing political communications through newspapers, magazines, outdoor advertising facilities, direct mailings, or other similar types of general public political advertising, or through flyers, handbills, or other nonperiodical printed matter, unless there appears on the form of publication in a conspicuous place or is contained within the political communication the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the publication or political communication. * * * [Id.]
Similarly, former R.C. 3517.20(B) required of radio and television advertisements that:
 No person shall utter or cause to be uttered, over the broadcasting facilities of any radio or television station within this state, any communication that is designed to promote the nomination, election, or defeat of a candidate, or the adoption or defeat of an issue or to influence the voters in an election, unless the speaker identifies himself or herself with his or her name and residence address or unless the communication identifies the chairperson, treasurer, or secretary of the organization responsible for the communication with the name and residence or business address of that officer. * * * [Id.]
In this case, appellant makes no claim that her name was used by Northland without her knowledge or consent. She also makes no claim that her name was used without her authorization, or that it was used fraudulently. Quite simply, given her claim that she did not, and did not wish to take part in publishing or authorizing the "cash patrol" advertisement, appellant offers no credible reason why her name appeared on Northland's campaign material, including the "cash patrol" advertisement, and not the name of Northland's treasurer or secretary. If appellant did not wish to sanction, authorize, or be associated with this advertisement, she should not have authorized her name to be displayed on Northland's campaign materials in general, or this advertisement in particular. Accordingly, appellant's first and second assignments of error are overruled.
In her third assignment of error, appellant disputes the finding of the Commission and trial court that the statements made in the "cash patrol" advertisement were false statements of fact and not, as she claims, statements of opinion. While opinion is protected speech, untruthful factual statements are not. With that in mind, we must first distinguish between the two.
Appellant claims that this court should find that because the allegedly false statements were made in opposition to the 1996 TIF ordinance, and in support of an initiative to overturn it, the statements constitute opinion and are therefore constitutionally protected. Appellant argues further that the statements made in the "cash patrol" advertisement constituted opinion, as a matter of law, because they concerned a political issue. While we do not dispute her declaration that legitimate statements of political opinion are constitutionally protected speech, appellant is clearly wrong in her unqualified assertion that any statement made in the context of political speech is de facto opinion.
The process by which we distinguish whether a statement is fact or opinion involves a consideration of the totality of the circumstances. In Milkovich v. Lorain Journal Co. (1990), 497 U.S. 1, the United States Supreme Court applied an objective standard to assess the meaning of allegedly libelous statements which had been published in a newspaper column about a high school wrestling coach. In that case, the columnist accused Milkovich, a wrestling coach, of having lied during the course of his testimony before a common pleas court concerning a melee which occurred after a wrestling match. On appeal, the Supreme Court concluded that the dispositive issue concerning the falsity of the statements was "whether a reasonable factfinder could conclude that the statements in the * * * column imply an assertion that Milkovich perjured himself in a judicial proceeding." Id. at 21.
In reaching this conclusion, the Supreme Court was careful not to consider the columnist's subjective opinion of the statements made in the column. Rather, the Supreme Court explained that the "dispositive question" was whether a reasonable factfinder could conclude that the statements were false. As the Ohio Supreme Court later noted: "If the law were otherwise, publishers of false statements of fact could routinely escape liability for their harmful and false assertions simply by advancing a harmless, subjective interpretation of those statements." McKimm v. Ohio Elections Commission (2000), 89 Ohio St.3d 139, 142,145.
The General Assembly authorized the Commission to investigate allegations regarding the dissemination of false and misleading statements and to take appropriate punitive action when it concludes that a violation has occurred. However, that authority may be exercised only when it does not trample upon the freedoms of speech and press. Id. at 142. In this case, both the Commission and the trial court concluded that Northland and appellant participated in the publication of false statements, and that they did so either with actual malice, or a reckless disregard for the truth. Having independently reviewed the record as we are required, we concur with these findings.
Beginning with the threshold question of whether the challenged statements constitute statements of fact or opinion, we note that in Scott v. News-Herald (1986), 25 Ohio St.3d 243, the Ohio Supreme Court set forth a general guideline to be followed when determining the meaning of an allegedly false or libelous statement. The court clarified that:
 * * * [A] [c]onsideration of the totality of circumstances to ascertain whether a statement is opinion or fact involves at least four factors. First is the specific language used, second is whether the statement is verifiable, third is the general context of the statement and fourth is the broader context in which the statement appeared. * * * [Id. at 250.]
The Ohio Supreme Court later reaffirmed this standard of review in Vail v. The Plain Dealer Publishing Co. (1995), 72 Ohio St.3d 279, adding that the "standard must be fluid." Id. at 282. "Each of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented." Id.
Having concluded a thorough, independent review, we find that the statements made in the "cash patrol" advertisement fall within the boundaries of statements of fact, not opinion. We begin by reviewing the language, "focusing on the common meaning ascribed to the words by an ordinary [person]." Id.
As portrayed in the "cash patrol" advertisement, several individuals holding balloons, one a microphone, and one an oversized check, approach an upper-class suburban home. They ring the doorbell, and the door is answered by a white middle-aged man. When he says hello, the group says "Congratulations. We're giving you up to $22 million of taxpayers' money." As the man and his wife smile and waive, the scene shifts to a narrator who says: "Believe it or not this is actually happening. A wealthy developer is getting up to $22 million of your tax dollars to help him develop and build a mall we don't need. A vote for Issue 33 will stop this ridiculous giveaway of our tax dollars. Vote against Issue 33, and the money's all his."
We believe the Commission and the trial court correctly assessed the meaning of the "cash patrol" advertisement, and properly found that an average viewer would mistakenly conclude that public money was being given away to a private developer. The scene depicted in the advertisement, as well as the language used, clearly conveys a message of unfairness. The advertisement leaves the average viewer with the message or belief that the taxpayers' money is being spent, not for public improvements, but to unfairly benefit a wealthy individual. It directly implies that a person, the "wealthy developer," is reaping a windfall of $22 million in public funds to benefit himself, that "our" tax money is being wasted, and that it is being "given away." See Masson v. New Yorker Magazine, Inc. (1991), 501 U.S. 496, which found under the circumstances of that case that a publisher's failure to warn that quotations were not accurate supported a finding that a reasonable reader would understand the quotations to be true and accurate. In this case, the statements made in the "cash patrol" advertisement are easily verifiable by reference to the very ordinance which Northland sought to repeal.
We next assess the general context of the advertisement. In doing so, we find little to suggest to a reasonable viewer that the statements published in the advertisement constituted the opinion of its authors, and were not statements of fact. There are no "cautionary terms, or `language of apparency'" which would place an ordinary person on notice that what was said was the author's opinion as to the effect of the Polaris TIF district. Scott, supra, at 252. As noted by the court in Scott, "[t]erms such as `in my opinion' or `I think' are highly suggestive of opinion[.] * * *" Id. However, in the "cash patrol" advertisement there is no qualifying language at all. Rather, Northland continued its campaign mantra in the "cash patrol" advertisement that "this is really happening."
We believe that the "cash patrol" advertisement leaves an average person with the impression that the city of Columbus was in reality giving millions of dollars of taxpayer money to a "wealthy developer" to build "his" mall. As Northland stated time and again during its campaign, "this is really happening." If Northland believed that it was poor public policy to fund the economic development of the Polaris business district, it could have easily presented that opinion, and the reasons for that opinion to the public in a fair and constitutionally protected manner. Those seeking the repeal of Ordinance 3106-96 might have thought the TIF district unfair, or poor public policy. However, neither that belief, nor the authors' subjective interpretation of the "cash patrol" advertisement transform the factual statements therein into a constitutionally valid form of protected speech. The tenor of Northland's campaign as a whole, as well as this advertisement in particular, was to attempt to persuade voters with what appeared to be factual, not commentarial or statements of opinion.
Moving to an examination of the general context, Northland was organized, and almost exclusively funded and controlled by The Jacobs Group. From a general perspective, it is reasonable to conclude that Northland existed for the purpose of preventing or eliminating competition with Northland mall, which in turn would be detrimental to Northland mall and The Jacobs Group.
Having considered and balanced the foregoing factors, we conclude the statements published in the "cash patrol" advertisement were presented as statements of fact, not opinion and, most importantly, that a reasonable factfinder would consider the statements to be factual. As Northland stated time and again during its campaign, "believe this or not, this is actually happening." Appellant's third assignment of error is therefore overruled.
In her fourth and fifth assignments of error, appellant complains the Commission and trial court incorrectly found that she acted with malice or reckless disregard for the truth because the creators of the "cash patrol" advertisement, upon whom she claims to have relied, engaged in an "unimpeachable" review process.
At great length appellant sets forth the details of the unimpeachable review process that was followed by those involved with the production of Northland's campaign material, arguing that this process, in addition to the subjective testimony of those involved, obviates any question that she or Northland acted with actual malice or reckless disregard. However, she then concedes that this process was not followed, and that the "cash patrol" advertisement was not subjected to Northland's unimpeachable review process due to the fact that it was late in the campaign and time was of the essence.
In light of this admission, it appears we need go no further to overrule appellant's remaining assignments of error, as the advertisement was admittedly not reviewed for truth or falsity prior to publication because Northland was in a rush to air the advertisement prior to election day. In light of this admission, appellant obviously could not have relied upon the nonexistent review of the "cash patrol" advertisement.
By permitting liability only for false statements made with actual malice or reckless disregard for the truth, the law encourages robust criticism of public officials and issues. Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323. While the actual malice, reckless disregard benchmark presents a high bar to recovery, it is not an insurmountable bar, as "[f]alse speech, even political speech, does not merit constitutional protection if the speaker knows of the falsehood or recklessly disregards the truth." McKimm, supra, at 147. In other words, there is no constitutional value in false statements of fact. Herbert v. Lando (1979), 441 U.S. 153.
Whether or not the evidence presented to the court ultimately supports a finding of malice or recklessness is a question of law. Harte-Hanks Communications, Inc. v. Connaughton (1989), 491 U.S. 657. According to the Ohio Supreme Court, judicial scrutiny should focus on the publisher's attitude toward the truth or falsity of the publication. Perez v. Scripps-Howard Broadcasting Co. (1988), 35 Ohio St.3d 215. While this "standard requires a clear and convincing showing," it can be satisfied by circumstantial evidence of the defendant's state of mind. Id. at 147-148.
In St. Amant v. Thompson (1968), 390 U.S. 727, the United States Supreme Court explained that a publisher acts with malice or a reckless disregard when the circumstances show that the person must have reasonably entertained serious doubt as to the truth of his or her publication. Worded differently, the standard is met if a statement is published with an apparent high degree of awareness of probable falsity. Garrison v. Louisiana (1964), 379 U.S. 64.
While the law requires an examination of the publisher's state of mind, it explicitly limits the ability of a publisher to avoid liability with self-serving testimony. In St. Amant, the Supreme Court explained:
 The defendant * * * cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. * * * [Id. at 732.]
In Herbert, supra, the Supreme Court recognized that an individual will "rarely be successful in proving awareness of falsehood from the mouth of the defendant himself." Id. at 170. Indeed, it would be a rare case where an individual accused of publishing a false or defamatory statement admitted that he or she did so with malice or recklessness. In this case, having thoroughly reviewed the record, we believe that the Commission and the trial court correctly determined that appellant and Northland either acted with malice, or recklessly disregarded the truth of the statements published in the "cash patrol" advertisement.
Appellant devotes a considerable amount of her brief to explain the process employed by the individuals hired by Northland to develop its campaign materials. And while it might be true that Northland employed the "best in the business," appellant claims that she had absolutely nothing to do with these individuals, or with the creation and review of the "cash patrol" advertisement. According to her testimony, appellant made no attempt as Northland's chairperson to participate in the development, consultation, or review of Northland's campaign material. She also claims to have taken no action to ensure that any of the campaign statements were truthful. Other than her effort to shift all responsibility to other individuals involved with Northland, appellant offers no convincing reason or explanation for why she had a reasonable belief that the statements in the "cash patrol" advertisement were true.
Appellant also testified that she was familiar with the Polaris TIF, and acknowledged that Ordinance 3106-96 explicitly provided that Polaris TIF funds are to be used to build or improve the public infrastructure of the Polaris business district. Significantly, she also admitted that the proposed mall did not qualify as a public improvement, and did not qualify for TIF funding pursuant to Ordinance 3106-96. Appellant also acknowledged that only commercial entities located in the geographic boundaries of the Polaris TIF district would pay into the Polaris TIF fund, not Columbus taxpayers as a group. Further, she testified that although she was aware of the first complaint and probable cause determination, she failed to make any inquiry after this determination and prior to the publication of the second "cash patrol" advertisement. It appears that appellant's admissions, actions, and state of mind stand in stark contrast to the statements made in the "cash patrol" advertisement.
We are also unable to find any convincing reason why Northland, or the individuals employed and associated with it, had a reasonable belief that the statements in the "cash patrol" advertisement were true. This is particularly true in light of the appellant's repeated assertions that the individuals employed by Northland were the best in the business, were intimately familiar with TIF districts in general, the Polaris TIF district in particular, and Ohio election law.
First, the "cash patrol" advertisement states that the city of Columbus is giving a wealthy developer money. This is clearly false. Absolutely nothing in Ordinance 3106-96 provided for the disbursement of funds or property to any private individual or entity. Second, the advertisement states that public money will be given to allow the developer to build his mall. This statement is also verifiably false. Ordinance 3106-96 unambiguously funds "public improvements," such as: (1) the widening and expansion of Polaris and Gemini Parkways, with appropriate signalization, turn lanes and related improvements; (2) improvements to the Polaris I-71 interchange; (3) improvements to I-71 between I-270 and the Polaris I-71 interchange; (4) water, sanitary sewer and storm sewer improvements, and (5) a bridge over I-71. None of the money was used to fund the building of the Polaris Fashion Mall. Third, the advertisement states that the "wealthy developer" will be given "up to" $22 million. As noted, no money, not to mention $22 million, was "given" away to a wealthy developer. In this case it is hard to believe that the professionals responsible for the "cash patrol" advertisement, knowing the simple provisions of Ordinance 3106-96, did not entertain serious doubts that the claims Northland was making were false.
Finally, appellant relies upon the purported fact that other members of the community held the same opinion regarding the Polaris TIF district as did Northland. She then claims that "[t]o repeat these statements in campaign advertising was not `reckless indifference to the truth' nor an `attitude of malice.' It was simple free speech." We are unpersuaded.
First, whether or not some other person made factual assertions similar to those made by Northland is irrelevant. Second, Northland, its consultants, and appellant certainly, and without question, would have been free to comment that they held the same opinion as did others. For example, there is no question that those associated with Northland could have stated that in their opinion, TIF's constitute "corporate welfare." Those parties could have stated their opinion that it is unfair to the taxpayers to improve the infrastructure of the Polaris business district, that it is unfair to allow the developer of the Polaris Fashion Mall to locate in that area in order to take advantage of the improvements, or that the money should have been used for a completely different purpose. However, these individuals erred when they published their opinion as fact and in this case, verifiably false fact. The Commission and the trial court correctly found there to be clear and convincing evidence that appellant acted with malice or reckless disregard for the truth of the matters published in the "cash patrol" advertisement. Appellant's fourth and fifth assignments of error are therefore overruled.
Before concluding, we deem it appropriate to briefly address appellant's claim that the trial court and this court should it decide to affirm the lower court, is "ignor[ing] the constitutional guarantee to speak freely * * *." Appellant's belief to the contrary, this opinion creates no new restriction on political speech. It does not turn opinion into fact or impose strict liability. Rather, under these circumstances, we find that the statements in question were not mere statements of opinion, but were carefully crafted factual statements designed to convey the incorrect message that the city of Columbus was giving Herb Glimcher $22 million in tax money to build a mall. In reality, this is entirely false.
For the foregoing reasons, all five assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, is affirmed.
Judgment affirmed.
BRYANT, P.J., TYACK and PETREE, JJ., concur.
[1] Northland mall, a large enclosed shopping mall, and the residential area which surrounds it is located on Morse Road in the city of Columbus.