RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0160p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

CARLO M. CROCE,

                *Plaintiff-Appellant*,

    *v.*

THE NEW YORK TIMES COMPANY; JAMES GLANZ; AGUSTIN ARMENDARIZ; ARTHUR OCHS SULZBERGER, JR.; DEAN BAQUET,

                *Defendants-Appellees*.

No. 18-4158

————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:17-cv-00402—James L. Graham, District Judge.

Argued:  June 20, 2019

Decided and Filed:  July 17, 2019

Before:  MOORE, COOK, and NALBANDIAN, Circuit Judges.

————————

## COUNSEL

**ARGUED:**  Gerhardt A. Gosnell, II, JAMES E. ARNOLD & ASSOCIATES, LPA, Columbus, Ohio, for Appellant.  Jay Ward Brown, BALLARD SPAHR LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  Gerhardt A. Gosnell, II, James E. Arnold, Damion M. Clifford, JAMES E. ARNOLD & ASSOCIATES, LPA, Columbus, Ohio, for Appellant.  Jay Ward Brown, Michael D. Sullivan, BALLARD SPAHR LLP, Washington, D.C., Keith W. Schneider, MAGUIRE & SCHNEIDER, Columbus, Ohio, for Appellees.  Bruce D. Brown, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Washington, D.C., for Amici Curiae.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  Some say there's no such thing as bad publicity, but Dr. Carlo Croce did not share this sentiment after the New York Times published an article that included allegations against him.  The article also questioned Ohio State University's ability to investigate properly these allegations because of a supposed conflict of interest.  Dr. Croce is a prolific cancer researcher at OSU, but some critics have made allegations against him.  The article at issue may be unflattering, but the question is whether it is defamatory.  In a thorough opinion, the district court thought not.  We agree.  The article is a standard piece of investigative journalism that presents newsworthy allegations made by others, with appropriate qualifying language.  For the reasons that follow, we **AFFIRM**.

## I.  BACKGROUND

Dr. Carlo Croce is a professor and the Chair of Human Cancer Genetics at The Ohio State University.  Over the course of his forty-five-year career as a cancer researcher, Dr. Croce has published over 650 papers.  R. 32 (Am. Compl. at ¶¶ 31–32) (Page ID #608).  Of these hundreds of papers, twelve have been subject to corrections and two more have been withdrawn with Dr. Croce's consent.  *See id.* ¶¶ 35–39 (Page ID #609–11).  (A few of these corrections and one withdrawal occurred *after* the publication of the New York Times's article.)  Dr. Croce's research has earned him numerous awards.  *See* R. 32-2 (Croce Resp. Ex. B) (Page ID #704–06).

The story behind the article in question begins on September 14, 2016, when Dr. Croce received an email from New York Times reporter James Glanz.  After this exchange, Dr. Croce agreed to speak with Glanz about "promising anti-cancer results" that Glanz was purportedly reporting on.  R. 32 (Am. Compl. at ¶ 43) (Page ID #611).  After the meeting, Glanz said that he would be in touch with Dr. Croce.

On November 1, 2016, Glanz followed up, but the tone of the communications changed.  Glanz emailed Dr. Croce as "a courtesy to let [Dr. Croce] know that the scope of [the New York Times's] reporting has broadened, and [Glanz had] made a few records requests at OSU and

other institutions." *Id.* at ¶ 49 (Page ID #613). About three weeks later, "Glanz sent a letter on New York Times letterhead to OSU and to Dr. Croce stating that Glanz had questions he wanted to 'put urgently' to Dr. Croce and OSU 'as part of an article' Glanz was preparing." *Id.* at ¶ 50 (Page ID #613); *see also* R. 32-1 (Glanz Letter). The letter (which was at issue in the district court but is not challenged on appeal) contained some loaded and pointed questions, many of which followed allegations made by others against Dr. Croce. *See* R. 32-1 (Glanz Letter).

The letter prompted Dr. Croce to retain counsel. On January 25, 2017, Dr. Croce, through his retained counsel, responded to the letter. The response denied the allegations, stating that "[m]any of the statements in [Glanz's] letter are false and defamatory." R. 32-2 (Croce Resp. at 1) (Page ID #684). On March 2, 2017, Glanz sent another email that contained "additional 'misconduct allegations.'" R. 32 (Am Compl. at ¶ 74) (Page ID #620). Dr. Croce's counsel responded to Glanz the next day and again denied each allegation. *Id.* at ¶ 74 (Page ID #620–21). No further communication occurred between the two sides.

Ultimately, the article was not about "promising anti-cancer" research. Instead, on March 8, 2017, the New York Times published an article on its website (and social media) with the title, "Years of Ethics Charges, but Star Cancer Researcher Gets a Pass"; and subtitle text, "Dr. Carlo Croce was repeatedly cleared by Ohio State University, which reaped millions from his grants. Now, he faces new whistle-blower accusations." R. 32-3 (Article at 1) (Page ID #707). Agustin Armendariz, another reporter, is listed as a coauthor with Glanz in the byline. When the New York Times posted the article on Twitter and Facebook, the tagline read: "A star cancer researcher accused of fraud was repeatedly cleared by Ohio State, which reaped millions from his grants." R. 32 (Am. Compl. at ¶ 77) (Page ID #621). Then the next day, March 9, 2017, the article appeared on the front page and above the fold in the printed edition, under the headline, "Years of Questions but Researcher Gets a Pass." *Id.* at ¶ 78 (Page ID #621). The article detailed various allegations against and criticisms of Dr. Croce—all casting him in an unfavorable light.

After the New York Times published the article online, it apparently reached the top of the New York Times's "'Most Popular' articles" list and attracted 444 comments from online readers. R. 32 (Am. Compl. at ¶ 80) (Page ID #622). Many of these internet commenters had

harsh words for Dr. Croce. *See generally id.* at ¶ 93 (Page ID #625–28). In addition to detailing the negative allegations and criticisms of Dr. Croce, the article also reads: "Despite the lashing criticisms of his work, Dr. Croce has never been penalized for misconduct, either by federal oversight agencies or by Ohio State, which has cleared him in at least five cases involving his work or the grant money he receives." R. 32-3 (Article at 2) (Page ID #708); *see also id.* at 3 (Page ID #709) (stating that Dr. Croce "denied any wrongdoing . . . ."); *id.* at 8 (Page ID #714) ("Dr. Croce was cleared in [two cases outlined in the article]. But that was just the beginning.").

Needless to say, Dr. Croce was not pleased with the article or the internet comments. So he sued. Dr. Croce brought defamation, false-light, and intentional-infliction-of-emotional-distress claims against the New York Times, Glanz, Armendariz, Arthur Ochs Sulzberger, Jr. (publisher of the New York Times), and Dean Baquet (executive editor of the New York Times) ("Defendants"). *See* R. 32 (Am. Compl. at 69–78) (Page ID #668–77). The Defendants filed a motion to dismiss, which the district court largely granted, except for one statement in the Glanz Letter. *See Croce v. New York Times Co.*, 345 F. Supp. 3d 961, 995 (S.D. Ohio 2018); R. 32-1 (Glanz Letter) (Page ID #682). Dr. Croce stipulated to dismissing this remaining claim with prejudice, thus allowing a clear path to appeal the district court's ruling. *See* R. 56 (Stipulated Order) (Page ID #1082).

## II.  STANDARD OF REVIEW

"We review de novo . . . the district court's grant of a Rule 12(b)(6) motion to dismiss . . . ." *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 596 (6th Cir. 2013). Although a court must view all facts in the light most favorable to the plaintiff at this stage, the article also speaks for itself. Consequently, "if a factual assertion in the pleadings is inconsistent with a document attached for support," a court is not bound to accept as true the plaintiff's factual allegation. *See Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (collecting cases).

Because we are sitting in diversity, we apply the law of the forum state. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). Ohio law governs this case, and we must apply the State's law as announced by its highest court. *Bank of New York v. Janowick*, 470 F.3d 264, 272 (6th Cir. 2006). If the Ohio Supreme Court has not provided guidance on the issue at hand,

we may consider the decisions of the State's courts of appeals, relevant dicta from the Ohio Supreme Court, as well as other sources such as "restatements of law, law-review commentaries, and the rules adopted by other jurisdictions." *Mazur v. Young*, 507 F.3d 1013, 1016–17 (6th Cir. 2007).

## III. DEFAMATION CLAIMS

Under Ohio law, "defamation occurs when a publication contains a false statement made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *Am. Chem. Soc'y v. Leadscope, Inc.* ("*ACS*"), 978 N.E.2d 832, 852 (Ohio 2012) (internal quotation marks omitted). To state a claim of defamation,

> the plaintiff must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.

*Id.* (citation omitted). The second element is at the heart of this dispute. A court must "decide as a matter of law whether certain statements alleged to be defamatory are actionable or not." *Yeager v. Local Union 20, Int'l Bhd. of Teamsters*, 453 N.E.2d 666, 669 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007).

The Ohio Supreme Court has stated that when a court is deciding "whether a statement is defamatory as a matter of law, a court must review the totality of the circumstances and . . . read[] the statement in the context of the entire publication to determine whether a reasonable reader would interpret it as defamatory." *See ACS*, 978 N.E.2d at 853 (alterations from original incorporated) (internal quotation marks omitted); *McKimm v. Ohio Elections Comm'n*, 729 N.E.2d 364, 371–72 (Ohio 2000) (holding that a reasonable reader would view a particular political cartoon and its accompanying text as a false factual assertion). Thus, Ohio has adopted a "reasonable reader" standard. If a reasonable reader, reading a statement in the context of the entire publication, would interpret the statement as defamatory, then the plaintiff has an actionable claim.

Before turning to the crux of this case, it is worth clarifying the scope of this appeal. In his briefs, Dr. Croce challenges only certain statements in the article, specifically what the parties label as Statements 1–5 and 10–14, as well as Statement 15 (which is the article as a whole). The Defendants, picking up on Dr. Croce's lack of reference to various issues in his opening brief, argue that these statements alone are at issue. *See* Appellees Br. at 7–9. Dr. Croce implicitly concedes that the scope of this appeal is limited to those statements by failing to respond to this argument in his reply brief. Accordingly, we focus our attention on the statements the parties argue about in their briefs. At any rate, as we will explain, Ohio law requires reading each statement in the context of the article as a whole, and we have therefore considered the statements in that context. *See ACS*, 978 N.E.2d at 853; *Painter v. E.W. Scripps Co.*, 148 N.E.2d 503, 506 (Ohio Ct. App. 1957). Dr. Croce has also forfeited claims related to the Glanz letter and statements made by Glanz in a radio interview by failing to develop any argument on them in his briefs. *See Engler v. Arnold*, 862 F.3d 571, 577 (6th Cir. 2017).

## A. The Article Is Not Defamatory

Applying Ohio law, we conclude that a reasonable reader would construe the article as a standard piece of investigative journalism that presents newsworthy allegations made by others, with appropriate qualifying language.

Starting at the top, the headline is, as the district court recognized, "the closest thing to defamation in all the complained-of statements . . . ." *See Croce*, 345 F. Supp. 3d at 978. The New York Times used the phrase "Gets a Pass" in both the online and print versions of the article.[1] On one hand, the implication of this phrase could be that Dr. Croce did not get the punishment he deserved for his alleged scientific misconduct; on the other hand, the phrase could cast *the university* in a negative light because the implication might be that OSU is responsible for not pursuing a vigorous enough investigation. The latter reading is arguably bolstered by the text immediately following the title: "Dr. Carlo Croce was repeatedly cleared by Ohio State University, which reaped millions from his grants." That is, OSU is cast as a conflicted party.

---

[1]The headline is Statement 1, and the similarly worded social media posts are Statement 2.

The reading for which Dr. Croce argues, however, is not entirely *un*reasonable because the headline and text below it imply that he is a questionable figure.

But the headline is not the whole story, and consequently the headline cannot be considered standing alone. *See Robb v. Lincoln Publ'g (Ohio), Inc.*, 683 N.E.2d 823, 837–38 (Ohio Ct. App. 1996); *Painter*, 148 N.E.2d at 506 ("It appears that the plaintiff has chosen to consider the headline separate and apart from the remainder of the article. This may not be done as the headline and news item to which it is attached must be construed together in determining the effect of an article claimed to be defamatory."). As the Ohio Supreme Court explained in *ACS*, "[T]he words of the publication should not be considered in isolation, but rather within the context of the entire [publication] . . . ." 978 N.E.2d at 853 (alterations in original) (quoting *Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 840 (6th Cir. 1988)). Considering headlines alongside their accompanying articles, rather than in isolation, makes sense because headlines are often a "'spin' put on facts to get the attention of the reader that distorts their true meaning." *See Robb*, 683 N.E.2d at 838. Accordingly, we turn our attention to the article as a whole.

In full context, a reasonable reader would interpret the article as a standard piece of investigative journalism. To be sure, the article quotes several of Dr. Croce's critics, i.e., the article states that allegations and complaints have been lodged against Dr. Croce. (This especially applies to Statements 3, 4, 5, 11, 12, and 13 in the article.[2]) Further, the article raises concerns about various errors in Dr. Croce's papers, as well as concerns about OSU's ability to investigate effectively allegations against him. *See, e.g.*, R. 32-3 (Article at 2) (Page ID #708)

---

[2]Statement 10, meanwhile, is at least substantially true and therefore not defamatory. *See Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 633 (6th Cir. 2015) (citing Ohio caselaw that has explained that a statement is not a "false statement" if it is "substantially true," or "if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it," or if it "is subject to different interpretations"). The article first mentions that "Dr. Croce said he believed that smoking was the primary cause of lung cancer; that belief, he said in his later statement, dated from 'long before' he joined the [Council for Tobacco Research]." R. 32-3 (Article at 5) (Page ID #711). Then Statement 10 reads: "Still, some of the research Dr. Croce pioneered in those years was used by the tobacco industry to fight the assertion that smoking caused cancer." *Id.* Meanwhile, in Dr. Croce's response to the Glanz letter, Dr. Croce did not dispute that his research was used in this way or that he worked with the Council for Tobacco Research; instead, he stated that he was unaware and did not approve of his research being used in that way. R. 32-2 (Croce Resp. at 15) (Page ID #698). It is difficult to see exactly how this statement is misleading, and again, the article states Dr. Croce's belief that smoking causes lung cancer.

("Dr. Croce's story is a case study of the complex and often countervailing forces at work as science seeks to police itself. . . . [T]he primary burden for investigating and punishing misconduct falls to inherently conflicted arbiters: universities like Ohio State that stand to reap millions of dollars from the federal grants won by star researchers like Dr. Croce."). But stating that there are allegations against someone and raising these concerns does not necessarily imply guilt.

Put simply, the article does not say that Dr. Croce is guilty of any of these allegations and charges of scientific misconduct, nor does the article suggest that these allegations are true. If the article suggested that these allegations were true, or if the article did not use language that qualified the statements made by others as allegations, then the Defendants potentially could be liable for reporting third-party statements. *See Blesedell v. Chillicothe Tel. Co.*, 811 F.3d 211, 225 (6th Cir. 2016) (holding that a defamation claim was not actionable because "[defendant's] statement to [another individual] did not suggest that [the third party's] allegations were true"); *Sabino v. WOIO, L.L.C.*, 56 N.E.3d 368, 379–80 (Ohio Ct. App. 2016) (holding that a newscast was not defamatory in part because of the use of qualifying language); *Murray v. Chagrin Valley Publ'g Co.*, 25 N.E.3d 1111, 1117 (Ohio Ct. App. 2014) (holding that a statement was not defamatory because it "was published as an opinion of one of the protestors, not as an accurate fact about [plaintiff's] reputation"). In this case, the accusations are couched in terms like, "Some scientists argue," "allegations," "claims of," "criticisms," "charges," and "complaints." Although the article notes instances of corrections to Dr. Croce's articles due to, for example, errors in data, those statements are true. Dr. Croce attempts to cut and paste together the worst portions of sentences, unmooring them from their full context, in order to support his claim that the article is defamatory. In its full and proper context, however, the article reports newsworthy allegations with appropriate qualifying language.

What's more, the article is not entirely unfavorable. The article explains that Dr. Croce has never been found to have committed misconduct "either by federal oversight agencies or by Ohio State, which has cleared him in at least five cases involving his work or the grant money he receives." R. 32-3 (Article at 2) (Page ID #708); *see also id.* at 8 (Page ID #714). It mentions

that Dr. Croce has denied wrongdoing. *Id.* at 3 (Page ID #709). And it quotes a Nobel Prize-winning biologist as saying:

> I would say [Dr. Croce] has made some important contributions to the molecular causes of cancer. . . . I can't condone the sloppiness he has in general. But if I look historically at what [Dr. Croce] has done, if I delete [him] from the scientific community, I think the scientific community is a little less, and that isn't true of everybody who publishes papers.

*Id.* at 4 (Page ID #710). Moreover, the article gives a mixed portrayal of one of Dr. Croce's critics, "Clare Francis," who is described as a "digital vigilante[]," "both legendary and loathed," "a scientific gadfly," and as having a "high-strung style." *See id.* at 2, 8 (Page ID #708, 714).

A reasonable reader would therefore interpret the article as presenting two sides of this controversy. This article is similar to one at issue in *ACS*, in which the Ohio Supreme Court held an article not defamatory as a matter of law when "[t]he article . . . contained a balanced report of both parties' arguments and defenses." *See* 978 N.E.2d at 853–54; *see also Early v. Toledo Blade*, 720 N.E.2d 107, 122–23 (Ohio Ct. App. 1998); *cf. Sabino*, 56 N.E.3d at 379–80 (holding that a newscast was not defamatory because it used qualifying language about child-pornography charges and "[t]he newscast could be reasonably understood to report that a . . . teacher was being investigated, yes, but [the teacher] does not dispute that he was being investigated at that time"). And although "it is clear that mere publication of a denial by the defamed subject does not absolve a defendant from liability for publishing knowing or reckless falsehoods," *Connaughton*, 842 F.2d at 837–38 n.6 (internal quotation marks omitted), this article does more, as the foregoing shows.

Two remaining arguments are worth addressing, but both ultimately lack merit.

*First*, Dr. Croce pleaded that the New York Times published with actual malice. Actual malice requires showing the defendant had knowledge that the statement was false or acted with reckless disregard for the truth. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Of course, even with qualifying language, a defendant could be liable for publishing statements with actual malice. *See Connaughton*, 842 F.2d at 837–38 n.6. This issue is particularly relevant to statements by Dr. Sanders, a professor at Purdue University. Dr. Croce misleadingly asserts that Dr. Sanders has disavowed his criticisms. In actuality, Dr. Sanders

does not deny that he made the statements that appear in the article, but rather, he denies that they are defamatory. *See generally Croce*, 345 F. Supp. 3d at 985–86. This argument is therefore unavailing.

*Second*, Dr. Croce points to a "companion article" that appeared on the second page of the paper's print edition, making the novel argument that this separate article endorses the accuracy of the allegations in the actual article at issue. This argument rests solely on half of the headline, "Open Records Close the Case"—specifically the "Close the Case" phrase. Assuming that a separate article on a separate page of the paper may be relevant, the second article here is predominantly about how, in Ohio, reporters can easily access certain records and how that helped Glanz and Armendariz unearth various documents. R. 32-5 (Open Records Article). As with the main article, Dr. Croce's contentions on this front do not hold up when reading the full article.

In sum, we hold that a reasonable reader would not interpret this article, considering it as a whole, to be defamatory. Even if one could quibble with this conclusion, the Defendants' arguments on the innocent-construction rule are strong. We turn to that next.

**B.  The Innocent-Construction Rule**

Dr. Croce argues that the panel must reverse if a reasonable reader *could* attribute a defamatory meaning to the article. This argument runs headlong into the innocent-construction rule. *See McKimm*, 729 N.E.2d at 372 (holding that the innocent-construction rule did not apply because the cartoon at issue was susceptible to only "*one* reasonable interpretation"—a defamatory one) (emphasis added). "According to this rule, if allegedly defamatory words are susceptible to *two meanings*, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." *Yeager*, 453 N.E.2d at 669 (emphasis added).

Dr. Croce's contention that this rule is not established in Ohio is not persuasive. In *McKimm*, the Ohio Supreme Court reasoned that "[t]he innocent-construction rule does not protect [the author's] cartoon in this case. The rule protects only those statements that are *reasonably* susceptible of an innocent construction." 729 N.E.2d at 372 (citing *Yeager*, 453 N.E.2d at 669). If Ohio had not adopted this rule, then it would be odd for the State

Supreme Court to recite the rule's contours and explain why it did not apply based on the facts on the case.  It could have said that Ohio does not recognize the rule.  *See Young v. Morning Journal*, 669 N.E.2d 1136, 1138 (Ohio 1996) ("This court has never recognized the 'neutral reportage' doctrine and we decline to do so at this time.").  The State Supreme Court did not explicitly reject, decline to accept, or even cast doubt on the validity of the innocent-construction rule in either *Yeager* or *McKimm*, despite the rule's use in the state appellate courts before (and after) *McKimm.  See Sweitzer v. Outlet Commc'ns, Inc.*, 726 N.E.2d 1084, 1091 (Ohio Ct. App. 1999) (collecting Ohio appellate court cases).[3]  This court, too, has recognized that Ohio has adopted this rule.  *See Boulger v. Woods*, 917 F.3d 471, 483 (6th Cir. 2019); *id.* at 485 n.2 (Nalbandian, J., concurring).

Dr. Croce's argument that the question of this rule's validity should be certified to the Ohio Supreme Court is also not persuasive.  For one, "certification is disfavored when it is sought only after the district court has entered an adverse judgment."  *See State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015).  That is the situation here.  Furthermore, as surveyed above, state law provides "a reasonably clear and principled course" to follow.  *Id.* (quoting *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009)).  That course leads us to apply the innocent-construction rule.

As our analysis in the prior section shows, this article and the statements in it can comfortably fall within the contours of the innocent-construction rule.  Even if the meaning of the article is ambiguous or debatable, an innocent reading can surely be adopted:  Yes, Dr. Croce has been the subject of criticisms and allegations, resulting in some corrections to his work, but no findings of deliberate misconduct have been made against him, he denies these allegations, and he is otherwise a successful cancer researcher.

Although a case involving a public official (and thus subject to a slightly different standard), the following passage from *Robb*, is particularly relevant here:

---

[3]*See also Webber v. Ohio Dep't of Pub. Safety*, 103 N.E.3d 283, 296–97 (Ohio Ct. App. 2017); *Sabino*, 56 N.E.3d at 380; *Holley v. WBNS 10TV, Inc.*, 775 N.E.2d 579, 583 (Ohio Ct. App. 2002); *Early*, 720 N.E.2d at 121–23; *Belinky v. Drake Ctr., Inc.*, 690 N.E.2d 1302, 1309 (Ohio Ct. App. 1996); *Robb*, 683 N.E.2d at 838–39.

> The news article and (especially) its headline are examples of one of the worst excesses of contemporary journalism: a "spin" put on facts to get the attention of the reader that distorts their true meaning. To the extent that it represents that monies were missing from Robb's custody, the article is false. However, *a discerning reader may yet understand from it that Robb was cited by the auditor for failing to "collect" monies from his own accounts that he was required by law to remit to Butler County, and that is true*. The words used in the article are, therefore, reasonably subject to an innocent construction, and malicious intent is not demonstrated.

683 N.E. at 838–39 (emphasis added). Here, to the extent that the article and its headline represent that Dr. Croce has in fact been found (by OSU or the federal government) to have committed scientific misconduct, it is false. A discerning reader, however, would understand that others have lodged allegations against Dr. Croce, none of which have resulted in an actual finding of misconduct, but corrections have been issued for Dr. Croce's papers—and that is true.

We therefore conclude that Ohio has adopted the innocent-construction rule, and we hold that this article is easily susceptible to an innocent construction.

**C. Statement 14 Is Substantially True**

Statement 14 is singled out as a separate issue in the parties' briefing, and the question is whether the statement is substantially true. It reads:

> As a result of complaints by Dr. Sanders and others, journals have been posting notices of problems with Dr. Croce's papers at a quickening pace. From just a handful of notices before 2013 – known as corrections, retractions and editors' notices – the number has ballooned to at least 20, with at least three more on the way, according to journal editors. Many of the notices involve the improper manipulation of a humble but universal lab technique called western blotting, which measures gene function in a cell and often indicates whether an experiment has succeeded or failed.

R. 32-3 (Article at 2) (Page ID #708). This statement follows a string of paragraphs that outline allegations made against Dr. Croce, including by Dr. Sanders. Dr. Sanders "has made claims of falsified data and plagiarism directly to scientific journals where more than 20 of Dr. Croce's papers have been published." *Id.* at 1 (Page ID #707). "'It's a reckless disregard for the truth,' Dr. Sanders said in an interview." *Id.* at 2 (Page ID #708).

We have explained previously that, in Ohio, "[a] statement is not a 'false statement' if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it. Moreover, a statement that is subject to different interpretations is not 'false.'" *Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 633 (6th Cir. 2015) (citation omitted). Accordingly, if "the 'gist' or 'sting' of the statement is substantially true," then the statement is not defamatory, *id.* (citation omitted), even if "[m]inor inaccuracies" exist, *see Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). "Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* (internal quotation marks omitted).

This is a "low threshold," *Driehaus*, 779 F.3d at 633, and the article clears it. The "gist" of this statement is true, and the purported inaccuracies, if any, are minor. To the extent that Dr. Croce disputes the number, any disparity is minor and would not change the effect on the reader. By Dr. Croce's own admission, at least twelve of his papers have been subject to a correction for one reason or another, and two papers have been withdrawn (with his consent). *See* R. 32 (Am. Compl. at ¶¶ 36–39) (Page ID #609–11). Others have in fact complained about Dr. Croce's work, and again his work has been subject to corrections for data that are incorrect or duplicated—in other words, people lodged complaints and then corrections were made. The article does not state that Dr. Croce intentionally falsified data or committed fraud. To the extent that this statement might possibly be interpreted that way, this statement, like the rest of the article, comfortably fits within the innocent-construction rule.

## IV. REMAINING CLAIMS

Dr. Croce's remaining false-light and intentional-infliction-of-emotional-distress claims can be disposed of quickly because their success rests on the defamation claims. On appeal, he simply argues that "[b]ecause the District Court erred in dismissing [the] defamation claims, the District Court equally erred in dismissing his false light and intentional infliction of emotional distress claims." *See* Appellant Br. at 54. The defamation claims fail, and no arguments remain to support the false-light and intentional-infliction-of-emotional-distress claims. Thus, we affirm the district court's dismissal of these claims as well.

## V.  CONCLUSION

For these reasons, we **AFFIRM** the district court.